273 Kan. 668 (2002)
44 P.3d 1237
MARK A. BECK, Appellee,
v.
BLUE CROSS and BLUE SHIELD OF KANSAS, INC., Appellant.
No. 86,214.
Supreme Court of Kansas.
Opinion filed April 26, 2002.
Mark G. Arnold, of Husch & Eppenberger, LLC, of St. Louis, Missouri, argued the cause, and Alan L. Rupe, of the same firm, of Wichita, and Jane Chandler Holt, of Blue Cross and Blue Shield of Kansas, of Topeka, were with him on the briefs for appellant.
Jeffery L. Carmichael, of Morris, Laing, Evans, Brock & Kennedy, Chtd., of Wichita, argued the cause, and Robert W. Coykendall and Jana D. Abbott, of the same firm, were with him on the briefs for appellee.
Jennifer L. Osborn, William Corum, and Steven L., Imber, of Blackwell, Sanders, Peper, Martin, LLP, of Overland Park, were on the brief for amicus curiae Blue Cross and Blue Shield of Kansas City and the Blue Cross and Blue Shield Association.
J. Philip Davidson and Tristram E. Felix, of Wallace, Saunders, Austin, Brown & Enochs, Chtd., of Wichita, were on the brief for amicus curiae Preferred Health Systems, Inc.
*669 The opinion of the court was delivered by
SIX, J.:
This is a breach of contract action. Resolution is based on our interpretation of K.S.A. 40-2,101, a "mandated-provider" or "freedom of choice" statute. Plaintiff Mark A. Beck, a chiropractor, was a contracting provider with defendant Blue Cross and Blue Shield of Kansas, Inc. (Blue Cross) from 1992 through 1996. Dr. Beck sued Blue Cross, claiming his contracts with Blue Cross violated K.S.A. 40-2,101. The jury awarded damages to Dr. Beck in the sum of $1,602,200.50.
Blue Cross appeals from the denial of its K.S.A. 2001 Supp. 60-250 motion for judgment as a matter of law (directed verdict) asking us to vacate the jury's verdict.
Our jurisdiction is under K.S.A. 20-3018(c) (transfer on our own motion).
The first impression issues are: (1) whether the contracts between Dr. Beck and Blue Cross violated K.S.A. 40-2,101, and (2) if the answer to issue (1) is "yes" and K.S.A. 40-2,101 prohibits disparate treatment of health care providers, whether there was evidence of a disparate impact on Dr. Beck. We hold that the contracts here do not violate K.S.A. 40-2,101. Thus, we do not reach the second issue. We reverse the judgment in favor of Dr. Beck and remand with instructions to enter judgment for Blue Cross.

FACTS
Dr. Beck is a chiropractor licensed by the Kansas Board of Healing Arts. During the relevant time period, Dr. Beck operated three chiropractic clinics in Wichita. Each clinic contracted with Blue Cross to provide chiropractic services to persons insured by Blue Cross.

The Contracts
Two types of form contracts prepared by Blue Cross between Dr. Beck and Blue Cross are at issue in here. The contracts govern the terms of reimbursement received by Dr. Beck from Blue Cross when services are provided to a Blue Cross insured. The first is the "competitive allowance program" contract (CAP contract) and *670 the second is the "Kansas Chiropractor Network contract" (KCN contract).
The CAP contract required Dr. Beck to perform medically necessary chiropractic services. Dr. Beck agreed to accept a maximum allowable payment, which Blue Cross would set each year for each procedure. He also agreed to a "most favored nation" clause, so Blue Cross would not pay more than Dr. Beck received from some other payor for any particular procedure. For each covered service, Dr. Beck agreed to accept the maximum allowable payment as payment in full.
In addition, Blue Cross periodically issued policy memos to supplement the provider agreement. The policy memos became a part of the agreement between Dr. Beck and Blue Cross. Both the CAP and KCN contracts said:
"Sec. III, GENERAL AGREEMENT OF THE PARTIES
"A. The chiropractor agrees to:
....
"2.... Future amendments shall be provided to the chiropractor at least 30 days prior to the effective date of the amendments. In the event that the changes in the policies and procedures are unacceptable to the chiropractor, this contract may be cancelled by providing written notice to Blue Cross and Blue Shield that the contract is to be terminated 30 days from the date of the notice. If the chiropractor has not exercised, in writing, a notice of cancellation of this contract on or before the effective date of such amendments, the chiropractor agrees to abide by such amendments as long as this contract shall remain in effect." (Emphasis added.)
The KCN contract was initiated in 1990 as a pilot program with chiropractors. If a chiropractor was a contracting provider under a KCN agreement, the chiropractor's billings would be adjusted or discounted from 0 percent to 50 percent, depending upon the chiropractor's average allowed charge per patient per year (AACPPY) from the previous year. The higher the chiropractor's AACPPY, the greater the discount applied to the chiropractor's billings the following year. The applicable discount was applied to the maximum allowed payment under the CAP contract. Thus, in 1996, Blue Cross agreed to pay Dr. Beck's usual charge for covered services, not to exceed the maximum allowed payment under the CAP contract less Dr. Beck's 50 percent discount under the KCN contract. *671 No discount was applied to Dr. Beck under the KCN contract from 1991 through 1995.
Blue Cross required health care providers to submit bills using the American Medical Association Current Procedure Technology (CPT) codes. However, the inclusion of a procedure in the codes did not mean that Blue Cross provided coverage for that procedure. The CPT code manual provided separate codes for office visits and manipulations. Blue Cross "Policy Memo No. 2 OFFICE/OUTPATIENT VISIT" said under "CONTENT OF SEVICE" that "[u]sual fees for the professional services" for office visits "are considered to include" the examination of the patient and any manipulations, the principal treatment offered by chiropractors. This policy is similar to the one used by Medicare, as Medicare did not pay chiropractors separately for an office visit during which a manipulation was performed. Dr. Beck did not exercise his right under either the CAP or the KCN contracts to declare the Policy Memo No. 2 amendment "unacceptable." Thus, he agreed "to abide by" its terms. In 1994, however, Dr. Beck did complain to Blue Cross that he was not permitted to bill separately for an office visit and a manipulation and was not getting paid for both services.
Dr. Beck also complained about Blue Cross' policy of paying him for adjusting the spine as one area, regardless of the number of manipulations performed on multiple areas, i.e., neck, mid back, and low back. This policy also was similar to Medicare's policy. Medicare will not pay for more than one manipulation on a particular visit.
Dr. Beck also was displeased with Blue Cross' policy on treatment modalities, i.e., heat packs, ice packs, ultrasound, traction, and therapy. If Dr. Beck were to bill for the use of more than two modalities per visit, Blue Cross would require additional paperwork. To avoid delays in payment, Dr. Beck chose to bill only for two modalities, even though he may have provided more during any given visit.
Although Dr. Beck disagreed with Blue Cross' payment policies, there is no dispute that he knew and understood what the policies were when he signed the CAP and KCN contracts in issue here.

*672 Proceedings below

Dr. Beck filed a three-count petition against Blue Cross. Count I alleged that Blue Cross violated K.S.A. 40-2,101 with respect to the CAP contract by (1) refusing to reimburse him for services rendered and (2) refusing to reimburse him in a manner consistent with its reimbursement of other health care providers performing similar services. Count II alleged a violation of K.S.A. 40-2,101 with respect to the KCN contract. Dr. Beck asserted that the sliding scale discount (1) discriminated against chiropractors, (2) failed to compensate chiropractors fully for services provided, and (3) failed to compensate chiropractors in a manner consistent with Blue Cross' compensation of other health care providers. Count III, later dismissed, alleged that the KCN contract was an unfair and deceptive trade practice.
In pretrial proceedings, Blue Cross moved for summary judgment on the basis that Dr. Beck had agreed to all of the cost containment measures challenged in his lawsuit. Blue Cross also contended that unequal levels of reimbursement to different health care providers did not violate K.S.A. 40-2,101. According to Blue Cross, K.S.A. 40-2,101 was not relevant to Dr. Beck's claims because the statute prohibited neither cost containment measures nor discrimination in the methods or rates of payment to health care providers.
In opposing the Blue Cross summary judgment motion, Dr. Beck did not dispute either that he had entered into the contracts voluntarily or that the contracts allowed Blue Cross to limit payment. Instead, he argued that his contracts violated K.S.A. 40-2,101 and, therefore, were unenforceable. Dr. Beck contended that K.S.A. 40-2,101 required Blue Cross to reimburse health care providers on an equitable basis. He also asserted that the statute would be meaningless if it permitted Blue Cross to reimburse chiropractors at a "substantially different level" than other health care providers.
The district court found that genuine issues of material fact precluded summary judgment, stating:
"A plain reading of [K.S.A. 40-2,101] makes it clear the legislature intended that a health care provider who gives a service which is within the realm of the provider's *673 expertise will not have that claim denied. The statute does not carry prohibitions against reduction contracts or require equal pay for all general services; i.e., the same rate of pay for manipulation as for back surgery. The primary purpose of the statute was to prevent health insurance carriers from denying a claim simply because they did not feel one area of practice governed by the Healing Arts Act should not [sic] be considered competent. In this manner, the statute does prevent discrimination against any field of practice governed by the Healing Arts Act."
At trial, Dr. Beck changed his theory of the case to conform to that ruling. His counsel stated that the issue of "disparity in pay" was taken out of the case. Instead, the theory was that Blue Cross' strategies for, containing the cost of chiropractic care violated K.S.A. 40-2,101 because they applied primarily to chiropractors rather than to other health care professionals.
Dr. Beck's counsel said:
"What's in the case is the fact that you won't reimburse a chiropractor for an office visit. You either have an office visit or an adjustment. He can't have both. You pay an MD for an office visit and other services provided. You are unfairly discriminating against chiropractors for no good reason.
"[Counsel for Blue Cross]: I don't think that's the evidence. I don't see us getting into that.
"[Dr. Beck's Counsel]: That's what the primary focus of my case is going to be."
During the jury instruction conference, the district court ruled that "where any provision of the contractual documents ... work to deny any part of [Dr. Beck's] claims in a discriminatory fashion, then those provisions ... will not be enforced." Dr. Beck's position was that a cost-containment measure applicable to chiropractors was discriminatory if it did not apply to other health care providers in the same fashion.
Dr. Beck testified that a reasonable charge for an office visit during 1992 to 1996 was $29.50. A reasonable charge for a manipulation during the same time period was also $29.50. He also testified "he never agreed with this price" but Blue Cross paid him $11.75 for an individual treatment modality from 1992 to 1996.
Finding by a preponderance of the evidence that Blue Cross breached its contracts, the jury returned a verdict in favor of Dr. Beck in the amount of $1,602,200.50. This amount is equal to the *674 sum of Dr. Beck's claim for damages attributable to the 1996 50 percent discount under the KCN contract ($70,000.00) and his claim related to payment of a single amount to cover office visits and manipulations ($1,532,200.50). Blue Cross moved for judgment as a matter of law. The motion was denied.

DISCUSSION
Blue Cross argues on appeal that the district court erred in denying its K.S.A. 2001 Supp. 60-250 motion for judgment as a matter of law. It contends that K.S.A. 40-2,101 does not prohibit insurers from entering into cost-control agreements. We agree.
The pivotal question here is whether the contracts between Dr. Beck and Blue Cross violated K.S.A. 40-2,101. Statutory interpretation is required in arriving at the answer. We have unlimited review. Sebelius v. LaFaver, 269 Kan. 918, 922, 9 P.3d 1260 (2000).
Dr. Beck raised seemingly contradictory claims in his petition against Blue Cross. He argued both that (1) Blue Cross breached the contracts, and (2) Blue Cross adhered to the contracts but certain provisions were void under K.S.A. 40-2,101. The contradiction points up the lack of merit in his arguments.
The fundamental rule of statutory construction is keyed to legislative intent. All other rules are subordinate. See Glassman v. Costello, 267 Kan. 509, 517, 986 P.2d 1050 (1999).
K.S.A. 40-2,101 is a "mandated-provider" or "freedom of choice" statute that requires insurers to pay for the services of specific types of health care providers. See Blue Cross & Blue Shield of Kansas City v. Bell, 798 F.2d 1331, 1333 (10th Cir. 1986). K.S.A. 40-2,101 states:
"Notwithstanding any provision of any individual, group or blanket policy of accident and sickness, medical or surgical expense insurance coverage or any provision of a policy, contract, plan or agreement for medical service, issued on or after the effective date of this act, whenever such policy, contract, plan or agreement provides for reimbursement or indemnity for any service which is within the lawful scope of practice of any practitioner licensed under the Kansas healing arts act, reimbursement or indemnification under such policy contract, plan or agreement shall not be denied when such service is rendered by any such licensed practitioner within the lawful scope of his license."
*675 In his appellate brief, Dr. Beck asserts that there were four violations of K.S.A. 40-2,101 in his contracts with Blue Cross: (1) refusal to pay separately for office visits and manipulations, (2) application of the KCN contract discount, (3) limitation of the number of modalities to two per visit, and (4) refusal to pay for more than one manipulation of the spine per visit.
The district court's theory, announced during the jury instructions conference, was significant in permitting Dr. Beck's claims to go to the jury. The district court ruled that "where any provision of the contractual documents, including the policies, work to deny any part of the plaintiffs claims in a discriminatory fashion, then those provisions ... will not be enforced."
Blue Cross contends that no fair reading of K.S.A. 40-2,101 can support such a theory. It argues that K.S.A. 40-2,101 prevents insurance companies from refusing to pay otherwise authorized charges to a provider who acts within the scope of his or her license. Blue Cross opines that the statute does not prohibit the use of creative cost-containment devices, even if those devices affect different kinds of health care providers in different ways. We agree.
K.S.A. 40-2,101 requires that Blue Cross pay for covered services if those services are within the scope of Dr. Beck's license. The statute says nothing about the price Blue Cross must pay for such services or the conditions that Dr. Beck must meet in order to receive payment. If Blue Cross provides coverage for a particular service, and Dr. Beck, as a provider, is licensed to provide that type of service, then Blue Cross must pay for that service in some fashion. K.S.A. 40-2,101 does not attempt to define what that fashion is. The statute does not dictate the price that Blue Cross must pay, the method of payment, or the conditions for payment.
Blue Cross argues that the legislature has affirmatively approved of the concept of cost containment in health insurance. It points to K.S.A. 40-231, which contains various prohibitions on the business in which an insurance company may engage. K.S.A. 40-231(b) provides in pertinent part:
"This section shall not prohibit an insurance company:
....

*676 (3) from negotiating and entering into contracts for alternative rates of payment with health care providers or other parties who have arranged for alternative rates of payment with health care providers, and offering the benefit of such alternative rates to insureds who select such providers."
Blue Cross reasons that the legislature's approval of alternative rates of payment in K.S.A. 40-231(b)(3) must harmonize with K.S.A. 40-2,101. We agree. Dr. Beck counters that K.S.A. 40-231(b)(3) has no effect on the interpretation of K.S.A. 40-2,101. If K.S.A. 40-231(b)(3) provides any guidance here, argues Dr. Beck, it is that the legislature could have explicitly exempted contracts for alternative rates of payment with health care providers from the provisions of K.S.A. 40-2,101.
Blue Cross argues that it is clear that K.S.A. 40-2,101 does not prohibit a disparate impact on different types of health care providers in either the price they receive or the terms and conditions of their payments. It notes that K.S.A. 40-2,101 does not use the term "discrimination," while other sections of the Kansas Insurance Code specifically prohibit discrimination. See K.S.A. 40-2,109 (prohibiting "unfair discriminatory premiums, policy fees or rates" based on mental or physical handicaps); K.S.A. 2001 Supp. 40-2404(7)(b) (prohibiting "unfair discrimination" in the "amount of premium, policy fees or rates charged for any policy or contract of accident or health insurance"); K.S.A. 40-2215(e)(1) (prohibiting "unfairly discriminatory rate[s]" charged to group sickness and accident policies providing hospital, medical, or surgical expense benefits). We agree with Blue Cross' contention that K.S.A. 40-2,101 and K.S.A. 40-231(b)(3) are to be harmonized.
The legislative history of K.S.A. 40-2,101 supports our conclusion. According to Dr. Beck, the purpose of K.S.A. 40-2,101 is shown in the title of this enactment. Dr. Beck quotes from the 1973 Kansas Session Laws that the act "[prohibits] the granting of any preference or discriminating between providers of health care services." L. 1973 ch. 195, sec. 1. However, Dr. Beck ignores other persuasive legislative history. During hearings on Senate Bill 277, which was later codified as K.S.A. 40-2,101, Dale M. Sprague, executive director and legal counsel of the Kansas Chiropractors Association, entered the following remarks on the record:

*677 "S.B. 277 as written is designed to remove long time discrimination against the Chiropractic patient by the insurance industry. Basically it provides the patient `freedom of choice' to utilize the health care services of any practitioner of the Healing Arts without financial regard and worry that his pre-paid health insurance will not cover costs incurred. The bill would eliminate `double payment' by the patient, once to a third party insurer and then to his Chiropractic doctor. It does not in any manner broaden or [a]ffect the scope of practice of the Chiropractor." Minutes, House Committee on Insurance, Mar. 16, 1973.
The above comments support Blue Cross' contention that K.S.A. 40-2,101 is inapplicable to health care provider contracts; rather, the statute was intended to provide freedom of choice to insureds. The freedom of choice concept is further emphasized by the fact that the legislature initially considered a version of Senate Bill 277 including additional language that "no such policy, contract, or agreement shall contain any clause or provision designed to grant any preference to or exclude or discriminate against any service provided by any practitioner licensed under the Kansas Healing Arts Act." (Emphasis added.) See 1973 S.B. 277. Senator Elwaine Pomeroy successfully requested an amendment to strike that language from the bill. Minutes, Senate Committee on Commercial & Financial Institutions, Feb. 20, 1973. The Committee voted to delete the additional language. The Senator subsequently explained that the Senate committee amended the bill to "take out language that would have caused problems for Blue Cross and Blue Shield." Minutes, House Committee on Insurance, Mar. 16, 1973.
Dr. Beck cites Cohen v. Metropolitan Life Ins. Co., 143 Misc. 2d 641, 541 N.Y.S.2d 284 (1988), and Moore v. Metropolitan Life Ins. Co., 33 N.Y.2d 304, 352 N.Y.S.2d 433, 307 N.E.2d 554 (1973), in support of his argument. Both cases are distinguishable on their facts. In Cohen, the insurance company refused to make any payment to optometrists for diagnostic examinations, but it did pay ophthalmologists for such services. In Moore, the insurance company refused to make any payment to psychologists for psychological services. Under Dr. Beck's provider contract with Blue Cross, chiropractic manipulations were paid as an included portion of the office visit. Likewise, the contract allowed Dr. Beck compensation for the administration of treatment modalities.
*678 Under a plain reading of K.S.A. 40-2,101, the contracts between Blue Cross and Dr. Beck in issue here did not violate the statute. Our holding disposes of the case; thus, we do not reach Blue Cross' alternative argument that, even if K.S.A. 40-2,101 prohibits disparate treatment of health care providers, there was insufficient evidence of a disparate impact on Dr. Beck.
The judgment is reversed. The case is remanded with instructions to enter judgment as a matter of law for Blue Cross.
ABBOTT, J., not participating.
CAROL A. BEIER, J., assigned.[1]
NOTES
[1] REPORTER'S NOTE: Judge Beier, of the Kansas Court of Appeals, was appointed to hear case No. 86,214 vice Justice Abbott pursuant to the authority vested in the Supreme Court by K.S.A. 20-3002(c).